STATE EX REL. RACINE COUNTY and others, Appellants, v. SCHMIDT, Director of State Department of Public Welfare and another, Respondents.

*May 7—June 26, 1959.*

For the appellants there were briefs by *Edward A. Krenzke,* corporation counsel of Racine county, *Erwin C. Zastrow,* district attorney of Walworth county, *Jack D. Steinhilber,* district attorney of Winnebago county, and *Michael, Spohn, Best & Friedrich,* special counsel for Racine county, attorneys, and *John S. Best, John K. MacIver,* and *James C. Mallatt* of counsel, all of Milwaukee, and oral argument by *Mr. Mallatt, Mr. John S. Best,* and by *Mr. George E. Rice,* assistant corporation counsel of Milwaukee county.

For the respondents there was a brief by the *Attorney General* and *James H. McDermott,* assistant attorney general, and oral argument by *Mr. McDermott.*

FAIRCHILD, J.   There are four issues as follows:

(1) Certain services rendered by a county give rise to a liability from the state to the county rendering the service and under some circumstances another county becomes liable to the first. The adjustment and collection of these accounts are made by officers of the state. Sec. 46.106 (2), Stats., requires the Department of Public Welfare to prepare a statement of county liability "on July 1st in each year." The statement is to be filed with the Director of Budget and Accounts. He is to commence the process of collection of amounts owed by counties and later to apportion and pay the proceeds to the counties to which money is due. Petitioners claimed on July 30, 1958, that in preparing the statement of county liability due the following day the Department of Public Welfare would, as it had in previous years, follow an erroneous formula. The alternative writ was issued and served June 30th returnable July 21st. The circuit court concluded in part that on June 30th, mandamus was not a

proper remedy because the duty to be performed under sec. 46.106 (2) was not yet due. Whether this conclusion be correct is the first issue.

(2) The circuit court also concluded that mandamus should be denied because an action for declaratory judgment would provide an adequate remedy while mandamus would lead to complications in the situation involved. The court pointed out that the preparation of the statement of county liability and the certifications by the Director of Budget and Accounts and the secretary of state which are to follow and to be based upon the statement are but steps in the process of determination by all the counties of the amount of their tax levies; that the secretary of state and the county boards are not parties to the action and that the court could not compel them to change any action which they might have taken in reliance upon the statement prepared by the department if prepared prior to the issuance of a peremptory writ. The court also directed attention to sec. 46.106 (6), Stats., providing for correction of any error in the accounts by adjustment in the next state tax, and the court intimated that if the issues of law between the parties were settled by a declaratory judgment, this correction procedure could be employed to make any necessary adjustment. Whether this conclusion be correct is the second issue.

(3) County liability is to be determined in part by applying sec. 51.08 (1), Stats., which specifies the basis for computation of "expense of maintenance, care, and treatment" of patients in the state and county hospitals for mental disturbances and county facilities for the mentally infirm, and provides for charging one half of the expense for patients in county hospitals and facilities to the state and one half to the county of legal settlement of the patient. The petitioners interpret certain language in this section differently from respondents. The circuit court did not reach this issue.

(4) Sec. 46.10 (2), Stats., imposes liability upon a patient's property, spouse, and certain relatives for the "patient's maintenance not exceeding the actual per capita cost thereof" and authorizes the Department of Public Welfare to collect it. The Department of Public Welfare is required to make appropriate credits to the county for any amounts recovered. Petitioners assert that the department uses the same formula for this purpose as it does under sec. 51.08 (1) and that the formula is erroneous. The circuit court did not touch upon this issue.

(1) *Prematurity of writ of mandamus.* The circuit court relied upon the sound general rule stated in *State ex rel. Board of Education v. Hunter* (1901), 111 Wis. 582, 588, 87 N. W. 485. "The general principle is frequently stated that mandamus will not lie to compel performance of an act by a public officer unless the act be one that is actually due from the officer at the time of the application." That was an action to compel a city treasurer to set aside for school purposes certain amounts out of taxes which he was about to collect. This court ordered the writ quashed, pointing out that the petition did not show whether at the time of filing any money at all had been collected which was properly applicable to the school tax. The court noted, however, that extreme cases might arise demanding the use of mandamus to control the performance of prospective duties.

This court found one exceptional case in *State ex rel. Rinder v. Goff* (1906), 129 Wis. 668, 109 N. W. 628. The supreme court there issued a writ to compel the county clerk to place the name of a candidate upon a ballot even though three weeks would elapse before the date on which the duty to print the ballots became absolute. The court said, however, that a writ issued at the time when the ballots must be printed (four days before the election) would be fruitless.

In the case before us the petitioners are counties. The issues involve the interpretation of statutes controlling the

distribution among counties of a tax burden in a very substantial amount. The respondent Director of Public Welfare is a state officer who had performed his duty in past years and undoubtedly would perform it again in the manner claimed by the petitioning counties to be illegal. Only a few hours were to elapse between the time the petition was filed and the date on which the statement was due to be prepared. The writ issued was an alternative writ returnable three weeks after the date on which the statute required that the duty of the Department of Public Welfare be performed. It may be safely assumed that the preparation of the statements of liability is a complex operation which could not be completely performed on any one day, and that the computations are made by subordinate employees who need to be instructed as to the formula to be used before the computation can be made. Under the circumstances, we think that the alternative writ (in so far as directed to the Director of Public Welfare) should not have been quashed because at the time that it was applied for and issued a few hours remained before the statutory date for the performance of his duty. While the obvious type of emergency that was present in the *Rinder Case* is not duplicated here, that case is authority for the use of some latitude in applying the general rule and the policy reasons supporting the general rule do not appear to be present in this situation.

In any event this reason for quashing the writ did not apply to the portion of the writ directed at the performance of the duties of the Department of Public Welfare under sec. 46.10 (2), Stats. Those duties of collection must of necessity be performed continuously from time to time. The attorney general concedes that the action is not premature as to these continuous duties of the Director of Public Welfare. *State ex rel. Milwaukee v. Milwaukee E. R. & L. Co.* (1911), 144 Wis. 386, 391, 129 N. W. 623.

(2) *Adequacy of alternative remedy.* The circuit court also concluded that the writ should be quashed because an action for declaratory judgment would provide an adequate remedy while the remedy of mandamus would lead to complications.

One may not resort to mandamus where another remedy is available which is competent to afford relief upon the same subject matter and is both adequate and specific. *State ex rel. Sheboygan County v. Telgener* (1929), 199 Wis. 523, 227 N. W. 35. Although it can reasonably be assumed that public officers will promptly conform to a judicial declaration of the meaning or validity of a statute, this court held in one case that an action for declaratory relief would not be an adequate alternative because the compulsion of the peremptory writ would be absent. *State ex rel. Scandrett v. Nelson* (1942), 240 Wis. 438, 3 N. W. (2d) 765. Even where mandamus was determined not to be a proper remedy, however, this court has, in order to avoid unnecessary delay in the determination of public questions, treated an action in mandamus as if it were an action for declaratory relief. Thus a final decision has been reached with a minimum of uncertainty. *State ex rel. Young v. Maresch* (1937), 225 Wis. 225, 273 N. W. 225 (clear duty could not be ascertained without resolving issues of fact); *Silgen v. Fond du Lac* (1937), 225 Wis. 335, 274 N. W. 256 (mandamus to disburse city funds held improper in absence of allegation that funds were in the treasury but the legal effect of certain salary reductions was declared).

Where the sole question is one of law and the moving party chooses mandamus for his remedy, there is ordinarily little reason to require him to change the form of his action into one for declaratory relief. It is true that in the present situation complications may arise as noted by the trial court, because of the necessary continuity of the accounting and taxing procedure, because of the inevitable lapse of time be-

fore final determination, and because other counties would be adversely affected if there were to be a change in the computations made under sec. 51.08, Stats. It may well be that these complications put the question of propriety of mandamus within the discretion of the circuit court. Even so, we conclude that where the circuit court within its discretion decided that mandamus was not the appropriate remedy, the court should have expedited the matter by following the suggestion of the *Young* and *Silgen Cases* and proceeding as if the action in so far as it pertains to sec. 51.08 were an action for declaratory relief.

(3) *Construction of sec. 51.08 (1), Stats.* The subsection reads as follows:

"MAINTENANCE. (1) The expense of maintenance, care, and treatment of each patient in any state hospital shall be at the rate of $5 per week, and in any county hospital or facility for the mentally infirm at the rate of $10 per week for the year beginning July 1, 1950, and annually thereafter equal in amount to the actual average per capita cost of maintenance, care, and treatment of such patients therein as determined from annual individual hospital reports filed with the state department of public welfare under the mandatory, uniform cost record-keeping requirement of sec. 46.18 (8), (9), and (10). For each such patient in any county hospital maintained at public charge elsewhere than in the county of his legal settlement the whole rate shall be charged to the state and one half charged over by the state against the county of his legal settlement. For other patients maintained in any county hospital at public charge one half of said rate shall be charged to the state and one half to the county of their legal settlement. . . . Such charge shall be adjusted as provided in sec. 46.106; but nothing herein shall prevent the collection of the actual per capita cost of maintenance or a part thereof by the department or by a county having a population of 500,000."

The dispute is over the meaning of "actual average per capita cost" of patients in a county hospital or facility as

determined from annual individual hospital reports. The Director of Public Welfare interprets the disputed phrase as meaning the per capita cost (per week) determined from the aggregate cost in the particular year at all county hospitals and facilities. The parties have sometimes referred to the rate thus determined as "state-wide average." The petitioning counties interpret the phrase as meaning the per capita cost (per week) for each institution determined from the cost in the particular year at the particular institution. The significance of the difference in interpretation is demonstrated in appellants' brief as follows:

"For an example of how this twofold injury works, according to cost analysis prepared by the state (the most-recent analysis available when suit was filed herein), the so-called 'state-wide average' cost for the fiscal year July 1, 1956, to June 30, 1957, was $18.709, while the actual average per capita cost was $8.772 per patient week in the Grant county hospital and $23.809 in the Winnebago county hospital.

"Thus, Winnebago county's share of the reimbursement to Grant county for the cost of maintenance, care, and treatment of a Winnebago county resident in the Grant county hospital was calculated on the basis of $18.709 while the actual average per capita cost for such patient was only $8.772. On the other hand, for a Grant county resident maintained in the Winnebago county hospital, Grant's share of the reimbursement to Winnebago was calculated on the basis of $18.709 while the actual average per capita cost to Winnebago was $23.809."

We shall refer to the computation of the rate ("actual average per capita cost") under sec. 51.08 (1), Stats., and the charging of the rate to the state and to the county of legal settlement as the charging procedure. For many years the charging procedure was based upon a weekly rate specified in the first sentence of sec. 51.08 (1). This rate was $4.24 per week in 1919, was changed by the legislature

from time to time, and in the 1949 statutes was $8 per week.

Statutory specification of the rate meant (1) that the rate could not reflect changes in cost except as the legislature might amend it from time to time, and (2) to the extent that care of patients was more expensive in one county than another the charging procedure resulted in an advantage to the counties where the cost was low and a disadvantage to counties where the cost was high. To that extent the same inequity now complained of by the petitioning counties has been present for many years. The crux of this branch of the lawsuit is whether the legislature in amending sec. 51.08 (1), Stats., in 1951 changed only the first element above mentioned or changed both.

The 1951 amendment was accomplished by enactment of ch. 688 of that session. Bill No. 45, A., and substitute amendment No. 1, A., which, as amended, became ch. 688, both provided that the rate used in the charging procedure should be the "actual per capita cost." The assembly rejected an amendment which would have changed the phrase to "average per capita cost." The senate adopted an amendment, the sole effect of which was to insert "average" after "actual," and concurred in the bill as so amended. The assembly declined to concur in the amendment, each house adhered to its position, and a conference committee was named. In accord with the committee report, the assembly receded from its position and concurred in the amendment. This history makes it very clear that "average" must be treated as significant.

Had the bill been enacted without the word "average," the position of the petitioning counties would seem tenable. "Per capita cost" itself denotes an arithmetic average. A total cost for a group is to be divided by the number of units in the group, and no one here questions the proposition that for the purpose of computing a rate per week under this

statute, the dividend is to be the cost for one year and the divisor is to be the number of patient weeks rather than the number of patients. The position of petitioning counties is, essentially, that the group intended was the total of patient weeks for each county hospital or facility, and not the total of patient weeks for all county hospitals and facilities, taken together. Apart from the word "average" the content of the first sentence of the subsection would indicate that the per capita cost intended was the per capita cost separately computed for each institution.

The use of a rate computed separately for each institution would appear to us to be fair and reasonable and the use of the state-wide average substantially favors the counties with lower per capita costs at the expense of the counties with higher ones. While it may be argued that higher costs may be due to inefficiency or extravagance, it seems more probable that the institutions having higher costs give better care to patients, or are located in areas where wages and prices are generally higher, or both. Nevertheless, it is our duty to ascertain the intent of the legislature, and to give effect to it. The purpose of the charging procedure is to distribute among counties the money contributed by the state (apparently half the total cost) for the care of mental patients in county hospitals and facilities, as well as to allocate the burden of caring for certain patients between the county of legal settlement and the county in whose institution the patient is cared for. It is for the legislature rather than the courts to choose the method to be employed, and it is clear, as previously mentioned, that from 1919 to 1951 the statutes provided that only one rate was to be used even though costs might differ.

We conclude that the state-wide average was intended by the legislature when it enacted ch. 688 in 1951.

Even though the subsection without the word "average" would have shown an intent that per capita cost at each

county hospital or facility was the rate to be used, it means something different with the word "average" present. This follows both from the general rule that effect must be given, if possible, to every word, *Greenebaum v. Department of Taxation* (1957), 1 Wis. (2d) 234, 83 N. W. (2d) 682, and from the legislative history showing that the insertion of this particular word was given specific consideration by both houses. It is true that the use of "average" did not make it perfectly clear how the average was to be computed, but at the very least it meant that the rate to be applied was not to equal per capita cost at each institution, but was to be some type of average thereof.

The first fiscal year for which the charging procedure was to be based on actual average per capita cost ended June 30, 1952. The then Director of Public Welfare was in doubt as to the computation required. He assumed that a state-wide average was intended (not a per capita cost for each county hospital or facility), but he was not certain whether (1) he should total the costs of all county hospitals and divide by the total of patient weeks, or (2) he should compute the per capita cost of each county hospital separately, then total these per capita costs, and then divide by the number of hospitals. The first formula would weight the average so as to reflect the different number of patient weeks at the different institutions; the second formula would be a simple arithmetic average of per capita costs.

The director inquired of the attorney general, who advised that the legislative intent, "however poorly it has been expressed," was that the average should be computed by the first formula. 41 Op. Atty. Gen. 286, 288. Although the attorney general acknowledged that the language in the remainder of the first sentence of the subsection indicated that costs would have to be computed on an individual hospital basis, he stressed, as we do, the insertion of the word "average." He stated that he was informed that the rate inserted

in the statute prior to 1951 had been arrived at by using the first formula and further that in the 1951 session of the legislature "the entire battle hinged pretty largely over the proposition of whether the costs were to be computed upon the basis of individual county hospitals or whether the average of all county hospitals was to be used, and that all those interested in the bill were satisfied that as finally enacted it contemplated the use of formula 1."

Had the opinion been promptly challenged in an action it would not have been conclusive, or had the legislature later changed the statute so as to express a different intention, it would not have been of much weight, but it is significant that it was apparently not challenged in any action from 1952 until 1958, and even more significant that during the same period three different legislatures were in session without enacting any law to correct the attorney general's error, if it were one.

Viewing the matter in the light most favorable to the petitioning counties, the words of the statute are ambiguous as to the type of average which is to be computed. A definite meaning was attributed to those words in 1952 in a published opinion of the attorney general. The administrative officers have applied that interpretation at all times. Private rights are not directly involved; those immediately concerned are officers of the state and of the counties. Petitioning counties evidently have much at stake, and if the attorney general misread legislative intent in 1952, they have suffered substantial injury as a result in every year since. It is hardly conceivable that if the attorney general were mistaken, his mistake would not have been called to the attention of the 1953 legislature.

Bill No. 83, S., of the 1957 session, has been called to our attention. It was introduced by the legislative council and although the senate ordered it engrossed, it was referred to committee and ultimately recalled and indefinitely postponed.

It would have repealed and re-created sec. 51.08, Stats., and provided, among other things, in substance that the rate for each county hospital or facility be the average of its own per capita cost per week and the over-all (state-wide) average per capita cost per week.

This bill, if enacted, would have prescribed a rate more favorable to petitioning counties than the state-wide average, but not as favorable as the per capita cost at each hospital or facility. The fact that it was introduced by the legislative council and received some consideration in one house shows that the very problem we are now considering was brought to the attention of the legislature in 1957 and suggests that at least the draftsmen and proponents of Bill No. 83, S., accepted the administrative interpretation of the 1951 act as the existing law.

Accordingly, we conclude that in so far as the alternative writ pertained to the alleged duty of respondents to use a different formula in performing duties under secs. 51.08 (1) and 46.106 (2), Stats., it was properly quashed. Because the Director of Budget and Accounts was included in the writ only in that respect, the judgment as to him is to be wholly affirmed. As to the Director of Public Welfare, it is to be affirmed in part.

(4) *Computation required under sec. 46.10 (2), Stats.* Sec. 46.10 (2) refers to any patient in any charitable or curative institution of the state or any county or municipality in which the state is chargeable with all or a part of the patient's maintenance, except certain tuberculosis patients. It provides that the patient, his spouse, his parents, if the patient be a minor, and the property and estate of each "shall be liable for such patient's maintenance not exceeding the actual per capita cost thereof." The disputed phrase is "actual per capita cost." The Director of Public Welfare claims that it means the state-wide average, the same average as "actual average per capita cost" in sec. 51.08 (1).

Sec. 46.10 (8) (f), Stats., provides that the department may make settlement with the counties for their proper share of all moneys collected.

Again the appellants in their brief have provided us with an illustration of the significance of the difference in interpretation. "For example, using the figures set out in note 1, page 9, *supra,* a Winnebago county relative of a patient maintained in the Grant county hospital during the 1956–1957 fiscal year, would have been sued by the department for an amount equal to $18.709 per patient week, while the actual per capita cost of maintaining such patient would probably have been much less since the actual average per capita cost of all such patients in the hospital was only $8.772. Thus the Winnebago relative could have been held liable for the patient's maintenance in an amount far exceeding the actual per capita cost. . . .

"On the other hand, the department would have sought recovery of but $18.709 from a relative of a patient maintained in the Winnebago county hospital, and Winnebago county would have been reimbursed on that basis while the 'actual per capita cost' of maintaining such patient could very well have far exceeded that amount. Thus the relative would be paying an amount less than the actual per capita cost of maintaining the patient, and would be enjoying a windfall gained at the expense of Winnebago county."

We are mindful of the fact that the only issues before us are questions of law raised by a motion to quash and that if there are facts which would raise any ambiguity or uncertainty in the meaning of sec. 46.10 (2), Stats., not apparent from its language, such facts are not before us.

In the phrase "actual per capita cost thereof," "thereof" means "of such patient's maintenance;" "such patient" means "any patient" in "any" of the institutions mentioned, state, county, or municipal. Sec. 46.10 (6), Stats., provides: "The per capita cost of maintenance shall be computed by the

department." No one claims that it means that a single per capita cost is to be computed for all publicly operated charitable and curative institutions taken together. It is apparently the position of the Director of Public Welfare that, for the purpose of collection from private resources for hospitalization in a county institution, only one per capita cost is to be computed and that rate will be applicable with respect to every such county institution. This per capita cost is to be computed according to the director by totaling the costs at all such county institutions and dividing by the total number of patient weeks in all. Where a patient has been hospitalized in a state institution, his position is different and a separate per capita cost is to be computed for each such state institution.

We think that the logical interpretation is that a separate per capita cost is to be computed for each institution covered by sec. 46.10 (2), Stats. The justification for computing an average or per capita cost for patients at one institution is the difficulty of making an exact determination of the cost attributable to each patient separately. With respect to many elements of cost, a determination could not be made in any way except by an averaging formula, but it is difficult to see any justification, in the light of the purpose of sec. 46.10 (2), for averaging, together with the cost of the institution at which the patient has been maintained, the costs of a number of other institutions operated by different counties. The purpose of sec. 46.10 is reimbursement of the county or other public treasury for what has been spent for maintenance of a patient who is able to pay or whose family is able to pay out of private resources. Why should the amount paid by a large number of counties for the operation of their hospitals affect the amount to be collected from one who is a patient in the hospital of another county? Undoubtedly, the per capita cost computed for a single hospital is generally a closer approximation of the cost of the maintenance of each

patient in that hospital than a per capita cost computed for all county hospitals taken together.

The director's position amounts to a claim that the same rate is to be used for recovery from private resources under sec. 46.10, Stats., as is to be used for the charging procedure under sec. 51.08 (1) (charging between state and counties). The two provisions do not suggest that the same rate is intended. Sec. 46.10 (1) provides: "Liability for the maintenance of patients in the institutions specified in this section and the collection and enforcement of such liability is governed exclusively by this section." Sec. 51.08 (1) uses, with reference to the charging procedure, the phrase "actual average per capita cost," which is a different phrase from the one used in sec. 46.10 (2), and also contains the provision, "but nothing contained herein shall prevent the collection of the actual per capita cost of maintenance or a part thereof by the department or by a county having a population of 500,000."

Sec. 51.08 (2), Stats., contains a provision which suggests that the phrase "actual per capita cost" means a per capita cost computed for a particular county institution. It requires the department of state audit to make an annual audit of the records and accounts of "each county hospital or facility for the mentally infirm." Such audits are required to ascertain compliance with the statutory record-keeping requirements and "verify the actual per capita cost of maintenance, care, and treatment of patients."

We are aware that the provisions of the statutes for the recovery of value or cost of maintenance from the private resources of a patient or his family have had a long and involved history. The Director of Public Welfare stoutly maintains in his brief that administrative construction of the provisions consistent with his present position determines their meaning. We have difficulty with this argument be-

cause the only facts before us are those set forth in the petition for the writ of mandamus and the present statutory provision does not appear to be ambiguous or uncertain. Upon this branch of the case it is our conclusion that the judgment quashing the writ must be reversed. Respondent Director of Public Welfare should be given a reasonable opportunity to plead further. But on the face of the facts now before us and the present language of the statutes, the petitioning counties would be entitled to a peremptory writ requiring the Director of Public Welfare to compute per capita cost and to carry out the collection procedure consistently with this opinion.

*By the Court.*—Judgment in so far as the alternative writ pertains to the duties of respondent Schmidt, Director of Public Welfare, under sec. 46.10 (2), Stats., is reversed, and cause remanded for further proceedings not inconsistent with the opinion filed herein. In all other respects, the judgment is affirmed.

MARTIN, C. J., took no part.