STATE of Wisconsin EX REL. Joyce JONES and
David Galicia, M.D., individually and as
representatives of the classes of persons
similarly situated, Petitioners-Appellants,

STATE of Wisconsin EX REL. STATE PUBLIC
DEFENDER, Attempted Intervenor and
Appellant,

v.

Richard GERHARDSTEIN, M.D., the Milwaukee
County Combined Community Services Board,
Donald Percy, and The Wisconsin Department
of Health & Social Services, Respondents-
Petitioners.

Supreme Court

*No. 85–1718. Argued September 8, 1987.—Decided December
21, 1987.*

(Also reported in 416 N.W.2d 883.)

710

711

712

For the respondents-petitioners there was a brief and oral argument by *Robert A. McKnight,* principal assistant corporation counsel, with whom on the brief was *George E. Rice,* acting corporation counsel, Milwaukee.

For the respondents-petitioners the cause was argued by *F. Thomas Creeron, III,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

For the petitioners-appellants and attempted intervenor and appellant, there were briefs and oral argument by *Thomas K. Zander, Legal Aid Society of Milwaukee, Inc.,* Milwaukee.

There were amicus curiae briefs by *Herbert S. Bratt, Edward S. Levin* and *Wisconsin Psychiatric Association, Inc.,* Milwaukee; *Sally L. Wencel, H. B. Maroney, II* and *State Medical Society of Wisconsin,* Madison; *Dianne Greenely* and *Wisconsin Coalition for Advocacy, Inc.,* Madison and *Thomas E. Dixon, Jr., Michael Perlin* and *Mary Burke, The National Mental Health Association, National Mental Health Consumer's Association,* and *The Mental Health Association of Wisconsin,* Madison.

STEINMETZ, J. This court accepted the petition for review to decide whether the involuntary administration of psychotropic[1] medication to persons committed pursuant to Chapter 51 of the Wisconsin Statutes violates their right to equal protection under the

---

[1] "Psychotropic. Affecting the psyche; denoting, specifically, drugs used in the treatment of mental illnesses." Stedman's Medical Dictionary (4th ed. 1976).

713

United States and Wisconsin Constitutions, when those persons have not been found to be incompetent to make treatment decisions. The distinction between precommitment detainees and involuntarily committed patients for purposes of drug administration does not have a rational basis when members of both groups are competent to decide.

The Wisconsin Department of Health and Social Services (a state agency) and the Milwaukee County Combined Community Services Board (a county agency) as petitioners raise several jurisdictional and procedural issues. They claim the courts lacked personal jurisdiction based on inadequate service of process. They further challenge the habeas corpus jurisdiction of the trial court to raise the substantive constitutional issue. Finally, petitioners argue that Jones and Galicia lacked standing to bring the action commenced because there was no case or controversy and because this was not a proper class action. Alternatively, they claim that the action was properly dismissed by the trial court as moot.

The respondents, Joyce Jones and David Galicia, M.D., were involuntarily committed for psychiatric treatment. This action was commenced on September 28, 1979, by the filing of a petition for habeas corpus and for declaratory and injunctive relief on behalf of Jones against Richard Gerhardstein, M.D. and the Milwaukee County Combined Community Services Board created pursuant to sec. 51.42, Stats. (the 51.42 board). On that same date, the Milwaukee county circuit court, the Honorable John E. McCormick, issued a writ requiring the production of Joyce Jones before the court. The issue in this case has therefore been before the court system for eight years.

At the first hearing, the county made an oral motion to dismiss the action as moot because Jones was no longer in the custody of the 51.42 board, her commitment having expired.

On October 16, 1979, an additional petitioner, David Galicia, M.D., was added to the lawsuit which implicated the state's responsibilities under chs. 51 and 971, Stats. Galicia had been involuntarily committed to the custody of the Wisconsin Department of Health and Social Services pursuant to sec. 971.17(1).[2] A summons was not used or filed at this time, but the writ used to engage the state's agency ordered the state to appear in court one day after the amended writ was served. A second hearing was held on October 22, 1979, at which time the state agency challenged the jurisdiction of the court.

Jones and Galicia filed a motion on November 5, 1979, purporting to state a class action covering all individuals who at that time or in the future might be involuntarily treated following commitment pursuant to sec. 51.20(13)(a)3, Stats.,[3] but who had not been

---

[2]Sec. 971.17, Stats., provides as follows:

**"971.17 Legal effect of finding of not guilty because of mental disease or defect.** (1) When a defendant is found not guilty by reason of mental disease or defect, the court shall order him to be committed to the department to be placed in an appropriate institution for custody, care and treatment until discharged as provided in this section."

[3]Sec. 51.20(13)(a)3, Stats., provides as follows:

"(13) DISPOSITION. (a) At the conclusion of the proceedings the court shall:

". . . .

"3. If the allegations specified in sub. (1)(a) are proven, order commitment to the care and custody of the appropriate county department under s. 51.42 or 51.437, or if inpatient care is not

adjudicated incompetent. A second class, allegedly represented by Galicia, was designated as those individuals committed to the custody of the Wisconsin Department of Health and Social Services pursuant to ch. 971. The county and state subsequently filed motions opposing class certification and motions to dismiss on various grounds, including jurisdiction and mootness. The State Public Defender filed a motion to intervene on May 2, 1980.

On June 20, 1985, the trial court issued a memorandum decision dismissing the amended petition as moot and denying the motion for class certification. On August 2, 1985, the court issued findings of fact and conclusions of law denying the motion for intervention and the motion for reconsideration. The court issued a judgment dismissing the action for lack of case or controversy and for mootness. This judgment was appealed to the court of appeals.

The court of appeals rejected all arguments of the state and county and reversed the trial court. *State ex rel. Jones v. Gerhardstein,* 135 Wis. 2d 161, 400 N.W.2d 1 (Ct. App. 1986). The court of appeals found the treatment authorization provisions of sec. 51.59, Stats.,[4] unconstitutional on equal protection grounds.

---

required order commitment to outpatient treatment under care of such county department; or"

[4]Sec. 51.59, Stats., provides as follows:

"**51.59 Incompetency not implied.** (1)   No person is deemed incompetent to manage his or her affairs, to contract, to hold professional, occupational or motor vehicle operator's licenses, to marry or to obtain a divorce, to vote, to make a will or to exercise any other civil right solely by reason of his or her admission to a facility in accordance with this chapter or detention or commitment under this chapter.

The state and county petitioned this court for review of that decision.

The state and county claim the courts lack personal jurisdiction over petitioners based on inadequate service of process. A review of the record reveals that on September 28, 1979, Attorney Robert A. McKnight, principal assistant corporation counsel for Milwaukee county, admitted service of the writ of habeas corpus, the order granting writ of habeas corpus and the petition for writ of habeas corpus on behalf of Dr. Gerhardstein and the 51.42 board. On October 1, 1979, Esther K. Hetzel, Dr. Gerhardstein's secretary, admitted service of these same documents on behalf of Dr. Gerhardstein. On October 16, 1979, Attorney McKnight admitted service of the amended writ of habeas corpus and the amended petition for the writ "on behalf of Gerhardstein and the 51.42 Board." The following day, Attorney Barbara Jaffe, legal counsel for the state, admitted service of these same amended documents on behalf of Donald Percy and the Wisconsin Department of Health and Social Services. Service of these documents was also admitted by the attorney general's office on October 19, 1979.[5]

"(2) This section does not authorize an individual who has been involuntarily committed or detained under this chapter to refuse treatment during such commitment or detention."

[5]Sec. 806.04(11), Stats., provides as follows:

"(11) PARTIES. When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration may prejudice the right of persons not parties to the proceeding. ... If a statute, ordinance or franchise is alleged to be unconstitutional, the attorney general shall also be served with a copy of the proceeding and be entitled to be heard...."

717

■
One basis for the service of process challenge is that no summons or complaint was ever filed in this case. However, sec. 801.02(5), Stats., authorizes the commencement of a habeas corpus action "by service of an appropriate original writ on the defendant named in the writ if a copy of the writ is filed forthwith." The writ of habeas corpus was filed on September 28, 1979, and the amended writ was filed October 16, 1979. Under sec. 801.02(5), a summons and complaint was not required to commence this action.

The second basis for the personal jurisdiction challenge raised by the county is that neither Dr. Gerhardstein nor Attorney McKnight were proper agents to accept service of process on behalf of the 51.42 board because neither of these individuals "had custody of the patients." Section 801.11(4)(a)7, Stats., provides that a court may exercise personal jurisdiction if there is personal service "against any other body politic, an officer, director, or managing agent thereof." Section 782.10(1) authorizes service of a writ of habeas corpus "By delivering a copy of the same to the person to whom it is directed."

■
Dr. Gerhardstein, when served, was a "director" within the meaning of sec. 801.11(4)(a)7, Stats. He is acknowledged to be the sec. 51.42 board's clinical program director pursuant to sec. 51.42(7)(b). Additionally, Dr. Gerhardstein was the medical director of the Milwaukee County Mental Health Complex; he had the authority to discharge involuntarily committed patients, and, therefore, was a custodian of these individuals for purposes of the habeas corpus jurisdiction.

Once jurisdiction was thus obtained over Dr. Gerhardstein, the responsibilities of the 51.42 board were implicated. Moreover, Attorney McKnight accepted not only the original documents, but the amended documents as well.

The amended writ of habeas corpus and amended petition for writ of habeas corpus were served on R. A. McKnight "on behalf of Gerhardstein & 51.42 Board." Dr. Gerhardstein had already been served with original documents and therefore assistant corporation counsel was accepting the amended documents as attorney "on behalf of" the doctor. This court stated in *Fontaine v. Milwaukee County Expressway Comm.,* 31 Wis. 2d 275, 279, 143 N.W.2d 3 (1966):

> "When an attorney-at-law formally acknowledges the receipt of a document as an attorney on behalf of a client, it may be presumed (in the absence of contradiction) that he was authorized by the client to accept it."

The amended documents were also served on Donald Percy and the Wisconsin Department of Health and Social Services by substituted service on "Barbara S. Jaffe, Legal Counsel on behalf of Donald Percy, Wis. Dept. of H&SS." Service of the amended documents was statutorily sufficient under secs. 782.10(1),[6] 801.11(1)(b)[7] and 801.11(4)(a)7, Stats.[8]

---

[6]Sec. 782.10(1), Stats., provides as follows:

**"782.10 Writ, who may serve.** Such writ can only be served by an elector of the state and shall be served as follows:

"(1)   By delivering a copy of the same to the person to whom it is directed."

[7]Sec. 801.11(1)(b), Stats., provides as follows:

**"801.11 Personal jurisdiction, manner of serving summons for.** A court of this state having jurisdiction of the subject

The state and county challenge the use of habeas corpus as a proper form of remedy. The original habeas corpus petition and the amended petition alleged unlawful confinement, and also that the petitioners were being forcibly administered psychotropic drugs without their informed consent when they have not been adjudged incompetent to refuse drugs by any court.

The first writ for habeas corpus and order was signed by circuit court Judge John E. McCormick on September 28, 1979, ordering Joyce Jones to be produced in court and further ordering the county: "[T]o show cause why the forcible administration of psychotropic drugs to the above-named petitioners should not be declared contrary to law, as alleged in the attached petition." In the order granting the writ, Judge McCormick, pursuant to sec. 814.29, Stats.,[9]

matter and grounds for personal jurisdiction as provided in s. 801.05 may exercise personal jurisdiction over a defendant by service of a summons as follows:

" . . . .

"(b)  If with reasonable diligence the defendant cannot be served under par. (a), then by leaving a copy of the summons at the defendant's usual place of abode:"

[8]Sec. 801.11(4)(a)7, Stats., provides that a court may exercise personal jurisdiction if there is personal service "against any other body politic, an officer, director, or managing agent thereof."

[9]Sec. 814.29(1), Stats., provides as follows:

"**814.29 Security for costs, service and fees for indigents.** (1)  Any person may commence, prosecute or defend any action or proceeding in any court, or any writ of error or appeal therein, without being required to give security for cost or to pay any service or fee, upon filing in the court, and receiving approval of the affidavit by the court, his or her affidavit that because of his or her poverty the person is unable to pay the costs of the action or proceeding, or any writ of error or appeal therein, or to give security for the same, and that the person believes that he or she

waived the payment of security for costs, service or clerk's fees and taxes. The petition challenged the constitutionality of secs. 51.20, 51.22, 51.59 and 51.61 which authorizes the forcible administration of psychotropic drugs to involuntarily committed individuals who have not been adjudged incompetent to refuse drugs.

Though the action was commenced as a writ of habeas corpus and service was proper therein, Jones and Galicia also sought declaratory judgment relief. This court has held that in the determination of public questions, courts may treat an action for an extraordinary writ as if it were an action for declaratory judgment. In this case, it is even stronger in that the pleadings, original and amended, have sought declaratory and injunctive relief.

Notwithstanding the propriety of invoking jurisdiction with the writ of habeas corpus, this case was also commenced as a declaratory judgment action; jurisdiction was well-grounded in this case. As this court stated in *bin-Rilla v. Israel,* 113 Wis. 2d 514, 521, 335 N.W.2d 384 (1983):

> "In ordinary civil cases, as in *pro se* prisoner petition cases, we look to the facts pleaded, not to the label given the papers filed, to determine whether the party should be granted relief. *State*

---

is entitled to the redress that he or she seeks in the action or proceeding, or writ of error or appeal, and setting forth briefly the nature of the cause or appeal, or defense. If the person subsequently recovers costs, the recovered amount shall first be applied to pay any service and filing fees which were waived under this subsection. This section does not prevent the affiant from recovering any service or fees waived under this section. If the person subsequently recovers these costs, the recovered amount shall be used to pay any costs waived under this section."

*ex rel. Furlong v. Waukesha Cty. Ct.,* 47 Wis. 2d 515, 522, 177 N.W.2d 333 (1970) (petition for a writ of prohibition treated as a petition for writ of habeas corpus); *Beane v. City of Sturgeon Bay,* 112 Wis. 2d 609, 334 N.W.2d 235 (1983)."

*State ex rel. Racine County v. Schmidt,* 7 Wis. 2d 528, 536, 97 N.W.2d 493 (1959) stated:

"Even where mandamus was determined not to be a proper remedy, however, this court has, in order to avoid unnecessary delay in the determination of public questions, treated an action in mandamus as if it were an action for declaratory relief. Thus a final decision has been reached with a minimum of uncertainty."

Also in *Racine County* the court stated:

"Even so, we conclude that where the circuit court within its discretion decided that mandamus was not the appropriate remedy, the court should have expedited the matter by following the suggestion of the *Young* and *Silgen Cases* and proceeding as if the action in so far as it pertains to sec. 51.08 were an action for declaratory relief." *Id.* at 537. *See also State ex rel. Young v. Maresch,* 225 Wis. 225, 273 N.W. 225 (1937) and *Silgen v. Fond du Lac,* 225 Wis. 335, 274 N.W. 256 (1937).

The requirements for an action for declaratory judgment were stated in *Lister v. Board of Regents,* 72 Wis. 2d 282, 306, 240 N.W.2d 610 (1976):

"The basic requirement in asserting a claim for declaratory relief is that there be a 'justiciable controversy.' Under this requirement, a controversy is not a proper subject for declaratory relief unless it: (1) Involves a claim of right on the part of the plaintiff which is asserted against one who has

an interest in contesting it; (2) is between two persons whose interests are adverse; (3) involves a legally protectible interest in the person seeking declaratory relief; and (4) is ripe for judicial determination. These prerequisites to the maintenance of a declaratory judgment action are designed primarily to insure that a bona fide controversy exists and that the court, in resolving the questions raised, will not be acting in a merely advisory capacity." (Footnote omitted.)

██ The amended petition for writ of habeas corpus meets the requirements for seeking declaratory judgment relief.

The state and county claim that any initially existing case or controversy was rendered moot in the trial court and on appeal because the commitments of Jones and Galicia expired shortly after the action was filed. We stated in *In Matter of G.S.*, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984):

"This court has consistently adhered to the rule that a case is moot when a determination is sought upon some matter which, when rendered, cannot have any practical legal effect upon a then existing controversy .... It is generally thought to be in the interest of judicial economy to avoid litigating issues that will not affect real parties to an existing controversy...."

However, we recognized in *G.S.* that:

"[T]his court has carved out certain exceptions to this general rule where: the issues are of great public importance; the constitutionality of a statute is involved; the precise situation under consideration arises so frequently that a definitive decision is essential to guide the trial courts; the issue

723

is likely to arise again and should be resolved by the court to avoid uncertainty; or, a question is capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within a time that would result in a practical effect upon the parties." *Id.*

In that case, which also involved forcible administration of psychotropic drugs to an involuntarily committed individual, we declined to apply the exceptions to the mootness doctrine. We stated:

"The personal liberty issues raised by involuntary commitment and forced psychotropic drugging are of public importance and susceptible to recurrence, but the potentially significant ramifications of a supreme court opinion on these subjects cannot be adequately measured when rendered outside an existing dispute." *Id.* at 806.

However, *G.S.* is distinguishable from the case at bar. The parties in *G.S.* conceded during oral argument that the issues were moot; no such concession is made in this case. Additionally, the state and county concede here that psychotropic drugs are forcibly administered to all patients; this concession was not made in *G.S.* This court is now convinced the issue regarding the constitutionality of the involuntary application of drugs to mentally competent persons who have been involuntarily committed is an issue of such statewide and pressing nature that it must be decided.

The present case is procedurally more similar to the one presented in *State ex rel. Watts v. Combined Community Services,* 122 Wis. 2d 65, 362 N.W.2d 104 (1985). *Watts* involved a class action comprised of

individuals seeking a declaratory judgment. Although they were still under protective placement orders, those petitioners were no longer involuntarily detained at any mental health center when the case reached this court. We stated in *Watts:*

> "The issues are of great public concern with regular recurrence and due to the limited period of confinement of ten days and fifteen days respectively under sec. 55.06(9)(d) and (e), a limited opportunity exists to bring the issues before the courts. By the time the issues are scheduled before trial courts, the petitioners similarly situated are likely no longer to be detained for diagnosis or treatment. The case is within the exception to the rule that this court does not consider moot issues as stated *In Matter of G.S.*, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984)." *Id.* at 71.

Though the commitments of both Jones and Galicia ended shortly after the commencement of the instant action, their histories of multiple hospitalizations demonstrate that the case and controversy created by the nonconsensual administration of psychotropic durgs to such individuals is clearly capable of repetition, yet it evades review due to the nature of intermittent commitments of individuals.

Even if the case were moot as to the named persons, however, it would qualify for consideration, in that societal treatment of involuntarily committed individuals is an issue of great public importance. As such, all the exceptions to mootness are sufficiently present in this case. Moreover, the state and county concede that psychotropic drugs are involuntarily given to all types of patients, so the issue arises frequently and affects a continuing class.

Before deciding the merits of the substantive constitutional issue, the respondent class requests that this court review the denial of the public defender's motion to intervene. The motion was brought under sec. 803.09(2), Stats. We decline to review the court of appeals decision affirming the trial court's exercise of discretion in denying this motion. The respondents prevailed on all other issues in the court of appeals, and the motion for intervention is not essential to the determination of the issue of the involuntary administration of psychotropic drugs.

Dr. Galicia was licensed to practice medicine in Wisconsin in 1971 as a psychiatrist. In the course of his practice as a psychiatrist, he treated hundreds of patients with the drug lithium carbonate. From December, 1977, through April, 1978, when he was a criminally committed patient at Central State Hospital, this drug was administered to him over his objections.

The parties' stipulations and testimonial evidence reveal that both Jones and Galicia objected to receiving the psychotropic drugs administered to them during the periods of involuntary hospitalization, and that neither had ever been declared incompetent by any court. Petitioners have also conceded that although both were released from custody shortly after the action began, both had a history of multiple involuntary hospitalizations. They have also conceded that psychotropic drugs can cause adverse effects and are administered to involuntarily committed individuals without their informed consent. The state and county conceded, "We have forcibly treated all the patients, competent or incompetent, that have been committed."

Medical experts of both parties testified about the substantial potential side effects caused by psychotropic drugs. It is undisputed that some of these drugs cause numerous side effects that are more prevalent than with any other drugs used in medicine. These side effects include, but are not limited to the following: dry mouth; dizziness; lowered blood pressure; skin itching; urinary retention; constipation; agranulocytosis (condition which damages blood producing system and can result in death); acute dyskinesia (involuntary movements of muscle system, *e.g.*, inability to keep legs still or paralysis causing eyeballs to roll up into the head); tardive dyskinesia (involuntary movements of fingers and mouth, *e.g.*, sucking movements and inability to keep tongue in or out of mouth);[10] dystonic reaction (involving muscle spasms of neck, back or eyes); parkinsonism (causing mask-like facial expression and difficulty walking upright); akathisia (inability to sit still); lethargy; sudden unexplained death (probably caused by irregular heart beat).

[10]If tardive dyskinesia is detected early and psychotropic drugs are discontinued, it can sometimes disappear, but if it becomes advanced, it may impair other muscle groups, including the trunk, causing difficulty in walking, talking and breathing. Testimony was that the incidence of tardive dyskinesia among patients continuously receiving psychotropic drugs is as high as 30 to 40 percent, and that the condition can result from as little as 30 days to six months of exposure to psychotropic drugs.

There was testimony that 20 percent of individuals treated with antipsychotic drugs develop tardive dyskinesia, but that the benefits of these drugs may outweigh that risk. It was stated that it is an oftentimes irreversible side effect and that 50 to 60 percent of young victims of tardive dyskinesia may recover while the recovery rate for older victims of tardive dyskinesia is only 20 to 40 percent.

The experts also agreed that some of these side effects can be reversed if detected early enough and if the psychotropic drugs are discontinued. Others can be treated or controlled with medication. However, it is undisputed that conditions caused by some of the side effects are oftentimes irreversible and can even be fatal. One does not need a medical degree to realize we are not discussing aspirin.

The medical experts testified that in psychology and psychiatry the concepts of mental illness and competency are not synonymous. An individual may be psychotic, yet nevertheless capable of evaluating the advantages and disadvantages of taking psychotropic drugs and making an informed decision. There was testimony that forcing psychotropic drugs on a competent individual who does not consent to their administration can be untherapeutic. There was agreement that under emergency circumstances within the hospital setting when the committed individuals posed an immediate threat of physical harm to themselves or others, informed consent should not be required to administer psychotropic drugs necessary to contain the emergency.

According to the testimony, the current practice at the Milwaukee County Mental Health Complex is to not inform patients about the side effects of psychotropic drugs, much less obtain their informed consent for the administration of these drugs. Yet, it was stated that all professional literature indicates that obtaining prior informed consent makes treatment using psychotropic drugs more effective and rapid than when they are forced on an individual.

There was testimony that on two examinations of Joyce Jones in October, 1979, she was experiencing side effects from the psychotropic drug mallaril of

fainting, dry mouth, stiffness, acute psychotic episode. At each of the doctor's examinations of Jones, he found her competent to decide to refuse the drug because she was able to express an understanding of the pros and cons of the medication, including the side effects and benefits, as well as the possible consequences of not taking the medication, *e.g.,* having to remain longer in the hospital.

Testimony of the medical experts indicated that 66 percent of precommitment detainees were competent to make decisions to receive drugs, 11 percent were incompetent to decide and 23 percent were unascertainable. The standard of competence used was the one set forth in sec. 51.61(1)(g), Stats.[11] Other

---

[11]Sec. 51.61(1)(g), Stats., provides as follows:

"(g) Prior to the final commitment hearing and court commitment orders, [patients] have the right to refuse all medication and treatment except as ordered by the court under this paragraph, or in a situation where such medication or treatment is necessary to prevent serious physical harm to the patient or to others. Medications and treatment during such period may be refused on religious grounds only as provided in par. (h). At or after the hearing to determine probable cause for commitment but prior to the final commitment order, the court may issue an order permitting medication to be administered to the individual regardless of his or her consent if it finds that such medication will have therapeutic value and will not unreasonably impair the ability of the individual to prepare for or participate in subsequent legal proceedings, and that there is probable cause to believe that the individual is not competent to refuse medication. Before issuing such an order, the court shall hold a hearing on the matter which meets the requirements of s. 51.20(5), except for the right to a jury trial. An individual is not competent to refuse medication if because of mental illness, developmental disability, alcoholism or drug dependence, the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages

ranges of patients competent to decide to receive psychotropic drugs were, according to the testimony, 33 percent to 90 percent.

Joyce Jensen testified on behalf of the respondent class. She stated that she was a registered nurse who had worked in that capacity for nine years. She testified that she was involuntarily committed in late May 1979, after a suicide threat made as a result of severe depression caused by her divorce and the loss of custody of her daughter. Immediately prior to her involuntary commitment, she had been refused voluntary admission to the Milwaukee County Mental Health Complex. While an involuntarily committed patient at the Milwaukee County Mental Health Complex, Jensen was forcibly injected with prolixin, a major tranquilizer. She took another major tranquilizer, haldol, under threat of forcible injection. These drugs caused her to experience a dry mouth, difficulty writing, nervousness, stiff muscles, difficulty driving a car and inability to hold a job.

Jensen testified that she had objected to the fact that these drugs were forced on her without receiving a pregnancy test, as had been the case in 1978 when she was, in fact, pregnant.

There was expert testimony that individuals who are found incompetent to stand trial under sec. 971.13, Stats., may nevertheless be competent to make decisions regarding the acceptance of psychotropic drugs. The same is true for persons found not responsible as

and alternatives have been explained to the individual. Following a final commitment order, the subject individual does not have the right to refuse medication and treatment except as provided by this section."

the result of mental disease or defect under sec. 971.17.

The experts agreed that no involuntarily committed individual in Wisconsin currently has the right to refuse to take these drugs, but the use of psychotropic drugs is not an essential form of treatment for individuals who are competent to decide whether to accept such drugs and who decline to take them. In fact, the forcing of psychotropic drugs on such an individual would adversely affect the rapport of the psychiatrist-patient relationship.

The experts stated that there are alternatives to administering psychotropic drugs, *e.g.,* psychosocial treatment, verbal psychotherapy, milieu therapy.[12] It was apparent from the testimony that the environment to which the patient is discharged, critical, unsupportive relatives versus supportive relatives, is generally more important for recovery than the treatment modality used at the hospital.

Involuntarily committed individuals are denied the right of informed consent regarding the administration of psychotropic drugs, even if they are competent to refuse such drugs, and when they pose no immediate emergency danger to themselves or others in the institutional setting. This right is denied by sec. 51.61(1)(g), Stats., which states: "Following a final commitment order, the subject individual does not have the right to refuse medication and treatment except as provided by this section." The language "except as provided by this section" refers to sec. 51.61(1)(h), which guarantees the right to be free from

---

[12]"Milieu therapy. The manipulation of the environment of a mental patient as an aid toward the patient's recovery." Webster's Third New International Dictionary.

unnecessary or excessive medication at any time and the right of individuals who are members of a recognized religious organization to refuse treatment and medication prohibited by the religion. Section 51.59(2) also states: "This section does not authorize an individual who has been involuntarily committed or detained under this chapter to refuse treatment during such commitment or detention." The statute permits involuntarily committed individuals to be forcibly administered psychotropic drugs even if they are competent to make informed decisions about accepting such drugs.

This court is asked to determine that the administration of psychotropic drugs to individuals not determined incompetent, without their informed consent, is a violation of a constitutional right to privacy under the United States and Wisconsin Constitutions. However, this court determines that the statutes at issue violate the equal protection clauses of the federal and state constitutions,[13] and we therefore decline to

[13]Art. XIV, sec. 1 of the United States constitution provides:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Art. I, sec. 1, Wisconsin Constitution provides:

"**Equality; inherent rights.** Section 1. All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

determine the issue on the basis of an invasion of bodily autonomy. We take the same direction as we did in *Watts.*

■

The constitutionality of a statute is a question of law which this court reviews de novo. *Bachowski v. Salamone,* 139 Wis. 2d 397, 404, 407 N.W.2d 533, 536 (1987). In *Chappy v. LIRC,* 136 Wis. 2d 172, 185, 401 N.W.2d 568, 574 (1987), we stated:

> "In analyzing a statute's constitutionality, '[e]very presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.' ... Thus '[i]f there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto."

■

There is no denial of equal protection if a reasonable basis exists for classification. *Voit v. Madison Newspapers, Inc.,* 116 Wis. 2d 217, 226, 341 N.W.2d 693 (1984). Where the classification does not involve a suspect class, equal protection is denied only if the legislature has made an irrational or arbitrary classification. *State v. Bleck,* 114 Wis. 2d 454, 468–69, 338 N.W.2d 492 (1983).

■

We find that there is beyond a reasonable doubt an irrational disparity of rights afforded to the class of persons involuntarily committed under sec. 51.20(13)(a), Stats.,[14] and to the class of persons held in

---

[14]Sec. 51.20(13)(a), Stats., provides as follows:

precommitment detention under secs. 51.15(8)[15] and 51.20(8)(c),[16] and, therefore, there is a violation of equal protection granted by the United States and Wisconsin Constitutions. Wisconsin statutory law de-

"(13) DISPOSITION. (a) At the conclusion of the proceedings the court shall:

"....

"3. If the allegations specified in sub. (1)(a) are proven, order commitment to the care and custody of the appropriate county department under s. 51.42 or 51.437, or if inpatient care is not required order commitment to outpatient treatment under care of such county department; or

"4. If the individual is an inmate of a state prison and the allegations under sub. (1)(a) or (ar) are proven, order commitment to the department and either authorize the transfer of the inmate to a state treatment facility or if inpatient care is not needed authorize treatment on an outpatient basis in the prison; or

"5. If the allegations specified in sub. (1)(a) are proven and the subject individual is a nonresident, order commitment to the department."

[15]Sec. 51.15(8), Stats., provides as follows:

"(8) TREATMENT. When an individual is detained under this section, the director and staff of the treatment facility may treat the individual during detention, if the individual consents. The individual has a right to refuse medication and treatment as provided in s. 51.61(g) and (h). The individual shall be advised of that right by the director of the facility or his or her designee, and a report of all treatment provided shall be filed by that person with the court."

[16]Sec. 51.20(8)(c), Stats., provides as follows:

"(c) During detention a physician may order the administration of such medications and therapies as are permitted under s. 51.61(1)(g) and (h). The subject individual may consent to treatment but only after he or she has been informed of his or her right to refuse treatment and has signed a written consent to such treatment. A report of all treatment which is provided, along with any written consent, shall be filed with the court by the director of the treatment facility in which the subject individual is detained, or his or her designee."

734

prives involuntarily committed individuals the right to exercise informed consent for the administration of psychotropic drugs, regardless of competency to make treatment decisions, even when they pose no immediate danger to themselves or others. However, this right of informed consent is granted to precommitment detainees pursuant to the first five sentences of sec. 51.61(1)(g). Members of this class have an absolute right to refuse psychotropic medication in nonemergency situations; hospital staff can override this right only pursuant to a court authorization based on an evidentiary finding at a hearing that there is probable cause to believe that the individual is incompetent to refuse medication.

If a court has found probable cause to believe that a precommitment detainee is mentally ill, a proper subject for treatment and dangerous under sec. 51.20(7), Stats., the detainee can only be forcibly medicated under two circumstances: if there is either a court finding that there is probable cause to believe that the individual is incompetent to refuse drugs or if it is necessary to prevent danger to himself or herself or to others within the hospital. However, after the individual has been found to be mentally ill, a proper subject for treatment and dangerous by clear, convincing evidence at the final hearing, the authority to which the individual has been committed can forcibly administer psychotropic drugs under the last sentence of sec. 51.61(1)(g), even if the individual is competent to make informed decisions about the acceptance of such drugs.

We agree with the court of appeals that there is no rational basis for granting the right of informed consent to precommitment detainees under secs. 51.15 and 51.20(8), Stats., pursuant to sec. 51.61(1)(g) and

depriving all other involuntarily committed individuals of this same right. There is a rational basis underlying the procedure required to forcibly administer psychotropic drugs to precommitment detainees. To be forcibly administered psychotropic drugs in nonemergency situations, there must be a finding of probable cause to believe that precommitment detainees are incompetent to refuse such drugs "because of mental illness, developmental disability, alcoholism or drug dependence" making "the individuals ... incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual." Sec. 51.61(1)(g). There is no rational reason for denying this same evidentiary standard to involuntarily committed individuals. None of the criteria for commitability under any of the involuntary commitment laws in Wisconsin require finding an individual incompetent to exercise informed consent.

The state and county argue that the abrogation of the committed individual's right to informed consent is justified because all involuntarily committed individuals have been found to be dangerous to themselves or others. Dangerousness is a prerequisite to involuntary commitment; however, such a finding is in no certain way related to whether the person is competent to accept or refuse psychotropic drugs. Moreover, the dangerousness finding for involuntarily committed individuals is not argued by any party on this record to be synonymous with incompetency to make choices about medical treatment.

While dangerousness may legitimately justify the state's authority to involuntarily commit an individu-

al, it does not justify the abrogation of the individual's right of informed consent with respect to psychotropic drugs. We hold that the right can be overridden only if there is a finding of probable cause to believe that the individual is incompetent to refuse drugs, as required for precommitment detainees by sec. 51.61(1)(g), Stats., or in a situation within the hospital setting when administration "is necessary to prevent serious physical harm to the patient or to others." Sec. 51.61(1)(g).

This court finds no rational distinction between the voluntary acceptance of psychotropic drugs by precommitment detainees and the nonconsensual administration of the same drugs for involuntarily committed individuals. In each class competency to choose must be presumed unless the condition of the individual is shown to be otherwise.

The state and county argue that prior to the probable cause hearing, there is no finding that the person is dangerous or is a proper subject for any kind of treatment. Until that hearing, the only reason the person is detained is either because a law enforcement officer has determined that the subject appears to meet the standard for commitment under sec. 51.15, Stats., or because a court has received a three-party petition pursuant to sec. 51.20(2) and has issued an order to detain the individual. The probable cause hearing only results in a finding of probable cause to believe that the individual is probably a danger to himself or herself or to others. This finding of dangerousness is not sufficient to commence involuntary treatment.

The state and county then argue that in stark contrast to the probable cause finding of dangerousness, once the burden of proof has been met under

sec. 51.20(13)(e), Stats., the status of the patient changes dramatically. The patient's common law right to refuse treatment has now been overcome by a showing based upon clear and convincing evidence that the person is mentally ill, a proper subject for treatment and, most importantly, dangerous. They argue this finding justifies a change of status with respect to the right of the individual to refuse treatment. They assert that inextricably bound up in this finding is the companion finding that the individual is a proper subject for treatment. This finding is not questioned, but the type of treatment, radical or conservative, is an issue if it is without informed consent. However, they then presume that this does not mean merely that treatment will rehabilitate the person, but that it is also a finding that the person cannot be effectively treated as a voluntary patient. They conclude that having found the patient to be dangerous and having found that voluntary treatment is not possible, a new status for the patient is created pursuant to sec. 51.59(2), resulting in the termination of the right of the patient to refuse treatment.

The state and county err in presuming that the finding of dangerousness makes voluntary treatment impossible. That is not a universally held opinion in psychiatric expertise or even in this record. In concluding that a finding of dangerousness terminates the right of the patient to refuse treatment, the state and county ignore the fact that the patient may be otherwise mentally competent to decide. The right to equal protection cannot be ignored even if it is more difficult for the treating facilities and more expensive for the governmental units involved. There is no corollary shown in this case between dangerousness and mental incompetence to make decisions regarding

drug therapy. This competency determination should be made through a judicial process at the time of commitment or later if and when drugs become necessary. Always, if an emergency causes danger during confinement to the patient or to others due to the patient's dangerousness, treatment may be professionally determined to meet the immediate need. This "implied consent" concept is a standard exception to the informed consent doctrine. *See, e.g.,* W. Prosser & W. Keeton, The Law of Torts sec. 18 (5th ed. 1984).

Section 51.59(1), Stats., states that a person is not deemed incompetent solely due to "his or her admission to a facility in accordance with this chapter or detention or commitment under this chapter." However, under subsection (2), the involuntarily committed or detained person is not authorized under the chapter to refuse treatment during such commitment or detention. It is arbitrary and unreasonable for the state to allow persons admitted, detained or committed to a facility under ch. 51 to manage his or her affairs, to contract, to hold professional, occupational or motor vehicle operator's licenses, to marry or to divorce, to vote, to make a will or to exercise any other civil right, but then to deny competent persons the right to refuse treatment using drugs potentially causing substantial and irreversible side effects.

The whole purpose of the development of the law outside the field of mental competency has been to recognize that the patient through informed consent makes the choices of bodily treatment. Medical doctors advise the patient on available alternative courses of treatment, but it is the patient who ultimately consents to the treatment. As long as a person is competent to make such choices which do not affect others, then that individual should be

allowed to decide whether to receive such a drastic form of treatment. The choice is based on reasonableness under all the circumstances; if a person is incompetent to make such reasoned choices, the courts must decide the reasonableness issue for the incompetent. The court has been presented with horror stories of delay in administering drugs, expense of delay and interference with professional judgment; however, when the state, through its agencies and agents, acts even with good intention, the constitutional rights of the recipients of its care must supersede these other considerations.

Our decision is not meant to undermine or intrude upon the professional judgment of treating physicians. This judgment is still important to the determination by a competent patient to accept psychotropic drugs. It is also valuable to a court determining the competency of an individual to make treatment decisions.

Institutional attitudes towards committed persons have changed. In the past, in most states psychiatric patients were generally presumed legally incompetent for all purposes. This presumption of incompetency has been reversed. Appropriate treatment remains at the heart of the state's endeavor. The issue presented here is whether the state has full autonomy in determining the treatment to be used or whether a competent individual may demand lesser intrusive treatment than psychotropic drugs.

When the class of involuntarily committed individuals is compared to psychiatric and medical patients voluntarily admitted to treatment facilities under sec. 51.10, Stats., the disparity of statutory treatment is even more apparent in an equal protection analysis. Patients admitted voluntarily under sec.

51.10(1) must be informed at the time of admission of their right to leave upon submission of a written request unless emergency detention is required because the patient is determined to be dangerous. Sec. 51.10(4m) and (5). The voluntarily admitted patient is otherwise afforded the absolute right to refuse medication in nonemergency situations. Where an emergency situation arises, *i.e.*, where the treatment director has reason to believe that the individual is dangerous under the standard provided in sec. 51.20(1)(a)2 or (am), the individual's status has changed to "precommitment detainee," and that person is afforded the right to refuse medication as stated in sec. 51.61(1)(g). Thus, the only class of individuals who are not given a right of any kind to refuse psychotropic drugs is the involuntarily committed patients. Because this initial presumption of competence is extended to both voluntarily admitted patients and precommitment detainees, it cannot be denied to involuntarily committed individuals.

Section 51.61, Stats., the so-called "patients' bill of rights," contains a grievance procedure designed to assure the protection of patients' rights and remedies. However, the bill of patients' rights was not intended as a limitation of constitutional rights guaranteed to all persons. The treatment rights of involuntarily committed persons as a class are not inferior to those of precommitment detainees if individuals in each class are competent to make decisions. Constitutional guarantees may not be replaced by professional judgment, and their protection and enforcement cannot be considered to be judicial interference. The protection of constitutional rights for mentally ill persons cannot

fairly be described as letting the patients "ro[t] with their rights on."[17]

The fact that an individual has been committed under sec. 51.20(1)(a), Stats., as a proper subject for treatment is not the same as finding the individual to be incompetent under sec. 51.61(1)(g). This criterion does not determine the forms of treatment which might be used or whether the individual consents to the administration of psychotropic drugs.

We do not agree with the rationale of *Stensvad v. Reivitz,* 601 F. Supp. 128 (W.D. Wis. 1985), that involuntary treatment using psychotropic drugs must be considered to be within the contemplation of the committing court. An involuntary commitment is not equivalent to a finding of incompetency with respect to involuntary treatment decisions. Also, we do not agree that constitutional safeguards are satisfied merely because psychotropic drugs must be prescribed by a physician. *Stensvad* held the statutory scheme at issue may well insure that "antipsychotic drugs are administered in a professionally acceptable manner." *Id.* at 131. These professional standards arguably satisfy due process requirements. *Youngberg v. Romeo,* 457 U.S. 307, 323 (1982). However, the use of professional standards does not alone guarantee equal application of the law to the two classes involved here. We are not bound by the decision in *Stensvad* and decline to follow it. *Groppi v. Wisconsin,* 400 U.S. 505, 507 (1971), *Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975).

Our holding in this case is consistent with the law in other jurisdictions. In Massachusetts the supreme

---

[17]Brief of the State Medical Society of Wisconsin as amicus curiae, p. 9.

court held in *Rogerts v. Com'r of Dept. of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983) that under Massachusetts common law, because involuntary commitment is not a determination that the committed individual is incompetent to make treatment decisions, such a determination must be made by a judge before a committed individual can be forcibly administered psychotropic drugs in nonemergency situations. The court held that if an involuntarily committed individual is judicially determined to be incompetent to exercise informed consent for the administration of psychotropic drugs, a guardian should be appointed to monitor treatment.

In *Opinion of the Justices,* 123 N.H. 296, 465 A.2d 484, 490 (1983), the New Hampshire Supreme Court interpreted its state constitution to require a prior finding of incompetency with "procedural protection to the patient" before forcibly administering psychotropic drugs to involuntarily committed patients.

The Colorado Supreme Court in *People v. Medina,* 705 P.2d 961 (Colo. 1985) held that under Colorado common law, psychotropic drugs may be administered to nonconsenting involuntarily committed individuals in nonemergency situations only after a judicial determination that there is clear and convincing evidence that the individual is incapable of making an informed treatment decision. In addition, that court required finding that: (a) the treatment with such drugs is necessary to prevent a significant and likely long-term deterioration in the individual's mental condition or to prevent the likelihood of the individuals causing serious harm to self or others in the institution; (b) a less intrusive treatment alternative is not available; and (c) the individual's need for treatment with such drugs is sufficiently compelling to

override any bona fide and legitimate interest of the individual in refusing treatment.

In *Rivers v. Katz,* 67 N.Y.2d 485, 495 N.E.2d 337, 341–42 (1986), the New York Court of Appeals recognized a state constitution and common law right of involuntarily committed individuals to exercise informed consent for the administration of psychotropic drugs. The court rejected the state's argument that committed individuals were presumptively incompetent to exercise informed consent, stating:

> "We conclude, however, that neither the fact that appellants are mentally ill nor that they have been involuntarily committed, without more, constitutes a sufficient basis to conclude that they lack the mental capacity to comprehend the consequences of their decision to refuse medication that poses a significant risk to their physical well-being. Indeed, it is well accepted that mental illness often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently, that mentally ill persons retain the capacity to function in a competent manner .... Nor does the fact of mental illness result in the forfeiture of a person's civil rights, ... including the fundamental right to make decisions concerning one's own body. ... Professor Brooks points out that 'there is ample evidence that many patients, despite their mental illness are capable of making rational and knowledgeable decisions about medications: The fact that a mental patient may disagree with the psychiatrist's judgment about the benefit of medication outweighing the cost does not make the patient's decision incompetent.'"

The New York court also held that a committed individual's right to exercise informed consent could only be overridden after a judicial hearing at which

744

the court found, by clear and convincing evidence: (a) the individual lacked the capacity to exercise informed consent, and (b) the benefits of psychotropic drugs outweighed their adverse effects.

The constitutional infirmity of the lack of equal protection between the statutory treatment of precommitment detainees and involuntarily committed individuals as to the involuntary application of psychotropic drugs is eliminated when the procedures and standards set forth in the first five sentences of sec. 51.61(1)(g), Stats., are held applicable to individuals following an order of involuntary commitment under secs. 51.20(13), 51.45(13), 971.14(5) or 971.17(1). This means that involuntarily committed individuals could be forcibly administered psychotropic drugs only under the following circumstances: (1) where such administration 'is necessary to prevent serious physical harm to the patient or to others"; or (2) where a court has determined that there is probable cause to believe that the:

> "[I]ndividual is not competent to refuse medication ... because of mental illness, developmental disability, alcoholism, or drug dependence [so that] the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual." Sec. 51.61(1)(g).

Under the remedial scheme announced in this case and also stated by the court of appeals, if the authority to which the individual is committed wishes to have authorization to forcibly administer psychotropic drugs to committed individuals, it can petition

the committing court to hold a hearing on the committed individual's competency under the standard in sec. 51.61(1)(g), Stats. The hearing could either be part of the original involuntary commitment hearing or be held anytime during the pendency of the involuntary commitment; such hearings could be held by court commissioners. In *Watts*, 122 Wis. 2d at 85–86, this court stated that a full due process annual hearing may be conducted by a court commissioner pursuant to sec. 757.69(1)(h).[18]

If the judge or court commissioner at the commitment hearing or subsequent proceedings, finds probable cause to believe that the individual is incompetent to make the personal decision to accept or reject psychotropic drugs under sec. 51.61(1)(g), Stats., the court shall issue an order authorizing use of psychotropic drugs. The order shall also require that appropriate medical standards be observed in their administration.

As with the commitment hearing, this finding of probable cause must initially be made in an adversarial setting in order to avoid having individuals routine-

---

[18]Sec. 757.69(1)(h), Stats., provides as follows:

**"757.69 Powers and duties of court commissioners.** (1) On authority delegated by a judge, which may be by a standard order, and with the approval of the chief judge of the judicial administrative district, a court commissioner appointed under s. 757.68 may:

". . . .

"(h) Hear petitions for commitment and conduct probable cause hearings under ss. 51.20 and 51.45, advise a person alleged to be mentally ill of his or her rights under the United States and Wisconsin constitutions and, if the person claims or appears to be unable to afford counsel, refer the person to the authority for indigency determinations specified under s. 977.07(1)."

ly declared incompetent for the sake of mere convenience, control or expense.

Jones and Galicia ask also for a guardian to monitor the drug administration once the determination of incompetency is made; however, this issue was not presented in the petition for review or ordered by the court to be briefed under sec. (Rule) 809.62(6) so the court will not consider it as being properly before the court.

*By the Court.*—The decision of the court of appeals is affirmed.

LOUIS J. CECI, J. (*dissenting*). The majority notes, but fails to attach proper significance to, the following fact: contrary to precommitment detention under ch. 51, Stats., underlying the involuntary commitment of individuals pursuant to ch. 51 is a determination of "dangerousness" established by "clear and convincing evidence." *See* sec. 51.20(13)(e). A determination of dangerousness includes, *inter alia,* findings that the individual evidences: (1) "a substantial probability of physical harm to himself or herself"; (2) "impaired judgment"; or (3) "behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for ... *medical care* ...." sec. 51.20(1)(a)2, Stats.[1] (Emphasis added.)

---

[1]"**51.20 Involuntary commitment for treatment.** (1) **Petition for examination.** (a) ... [E]very written petition for examination shall allege that the subject individual to be examined:

\* \* \*

"2. Is dangerous because the individual:

"a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

Thus, not only is the distinction between precommitment detainees and individuals involuntarily committed under ch. 51 significant, but the distinction is directly relevant to "medical care" and, as such, the capacity to exercise informed consent.

With this distinction in mind, it is important to recall the following oft-quoted principle: "There is a strong presumption supporting the constitutionality of any classification made by the Wisconsin legislature." *State ex rel. Watts v. Combined Community Services Board of Milwaukee County,* 122 Wis. 2d 65, 79, 362 N.W.2d 104 (1985) (citations omitted). Consequently, "'[i]f there is any reasonable basis upon which the legislation may constitutionally rest, the

"b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm....

"c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subparagraph if reasonable provision for the subject individual's protection is available in the community ....

"d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. No substantial probability of harm under this subparagraph exists if reasonable provision for the individual's treatment and protection is available in the community ...."

court must assume that the legislature had such fact in mind and passed the act pursuant thereto.'" *Chappy v. LIRC,* 136 Wis. 2d 172, 185, 401 N.W.2d 568 (1987) (quoting *State ex rel. Carnation Milk Products Co. v. Emery,* 178 Wis. 147, 160, 189 N.W. 564 (1922)). We have further stated, "'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.'" *Watts,* 122 Wis. 2d at 79 (quoting *Baxtrom v. Herold,* 383 U.S. 107, 111 (1966), citing *Walters v. City of St. Louis,* 347 U.S. 231, 237 (1954)).

Recently, this court restated the standard to be applied in determining the constitutionality of a statute challenged on equal protection grounds: "'[U]nless a statute may be said to affect a "fundamental right" or to create a classification based on a "suspect" criterion, the standard this court uses in reviewing the constitutionality of a statutory classification is the "rational basis" test.'" *Treiber v. Knoll,* 135 Wis. 2d 58, 70 398 N.W.2d 756 (1987) (quoting *Hilber v. State,* 89 Wis. 2d 49, 54, 277 N.W.2d 839 (1979)). It is my opinion that the distinction between involuntarily committed individuals and precommitment detainees not only satisfies the lower "rational basis" level of judicial scrutiny, but would further satisfy a "strict scrutiny" analysis. "Under strict scrutiny, a statutory classification will be upheld only if the classification promotes compelling government interests and if it is narrowly drawn to express only such interests." *Id.* The distinction at bar is necessary to promote a most · "compelling" state interest: the treatment of the mentally ill. *See* sec. 51.001, Stats. The majority, however, did not premise its decision upon either the implication of a fundamental interest or upon the

involvement of a suspect classification such as to justify the invocation of a strict scrutiny.[2] For this reason, I need not base my dissent upon the existence of a "compelling" need for the distinction directed under ch. 51. Rather, I dissent for the reason that the court has not shown beyond a reasonable doubt that a finding of dangerousness is not a reasonable basis for the legislative policy and determination which permits the nonconsensual administration of psychotropic medication to patients after a final ch. 51 commitment hearing but grants to precommitment detainees a right to refuse medication except in a situation where "medication ... is necessary to prevent serious physical harm to the patient or to others" or where there has been a hearing at which it has been determined that there is probable cause to believe that the individual is not competent to refuse medication.[3] Section 51.61(1)(g), Stats.

---

[2]In *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446 (1985), the United States Supreme Court rejected a characterization of the mentally ill as a "suspect class."

[3]The fault in the logic of the opinion of the majority becomes apparent when viewed in light of the fact that the basis of holding unconstitutional the forcible administration of psychotropic medication to individuals involuntarily committed under ch. 51 is the finding that the operation of the statute results in a denial of equal protection under ch. 51 since informed consent is granted to precommitment detainees. Since this holding is premised upon a denial of equal protection, could this unconstitutional result have thus been avoided by similarly permitting the forcible administration of psychotropic drugs to precommitment detainees? Surely not. Absent a final hearing at which an individual is determined by clear and convincing evidence to be dangerous, permitting the forcible administration of medication would unavoidably implicate considerations of due process. Those same due process considerations are, as apparently recognized in the majority

The distinction between involuntarily committed individuals and precommitment detainees is that only involuntarily committed individuals have been found to be dangerous by clear and convincing evidence. To the extent that a finding of dangerousness includes a substantial probability that the individual presents a threat of physical harm to himself or herself or an inability to satisfy his or her own medical care needs, this distinction is rationally related to the legislative refusal to subject such individuals to their own impaired judgment regarding medical treatment.

As a final note, I would comment that even if the distinction between precommitment detainees and involuntarily committed individuals could be disregarded such that an equal protection analysis would be appropriate, the analysis employed by the majority does not accord the protection it deems necessary. Specifically, if equal protection requires that involuntarily committed individuals be provided the process outlined under Sec. 51.61(1)(g), Stats., for precommitment detainees, the focus should be on the fact that a "due process" hearing is required prior to the forcible administration of drugs of precommitment detainees and not on the articulated "probable cause" standard

opinion, not present once the individual is committed where professional standards govern the administration of the medication. Opinion at 742 (citing *Youngberg v. Romeo,* 457 U.S. 307, 323 (1982)). Consequently, the rationale employed by the majority opinion fails since the distinction at issue, which permits, without impinging upon procedural due process, the forcible administration of psychotropic drugs to involuntarily committed individuals but would bar, due to considerations of due process, the forcible administration of medication to precommitment detainees, exists with equal force as a rational basis under an equal protection analysis.

which satisfies "due process" concerning the temporary detention of a precommitment detainee but not individuals involuntarily committed after a final hearing. The disregard for the distinction ineluctably separating precommitment detainees from involuntarily committed individuals suggests a myopic application of an improperly invoked equal protection analysis. Stated otherwise, if an equal protection comparison is appropriate, which, for the reasons I have stated above, I firmly believe is not, the analysis should focus on the denial to involuntarily committed individuals of the right to an incompetency determination by the *same standard* as is applied for the purpose of detention.

For the reasons stated, I dissent.