**COURT OF APPEALS
DECISION
DATED AND FILED**

**November 26, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2025AP1183**

**STATE OF WISCONSIN**

Cir. Ct. No.  2008ME113B

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF T.W.P.:

PORTAGE COUNTY,

    PETITIONER-RESPONDENT,

 V.

T.W.P.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Portage County: PATRICIA BAKER, Judge. *Reversed.*

¶1       NASHOLD, J.[1]   Since 2008 or 2009, T.W.P. has been committed under WIS. STAT. ch. 51.  This is T.W.P.'s appeal of the most recent extension of

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

that commitment and the associated order for involuntary medication. The circuit court determined that T.W.P. is dangerous under two of the five statutory standards of ch. 51: WIS. STAT. § 51.20(1)(a)2.c. ("the third standard") and § 51.20(1)(a)2.d. ("the fourth standard"). As to each standard, the court deemed T.W.P. dangerous on the basis that T.W.P. would become a proper subject for commitment if treatment were withdrawn, as is permitted by § 51.20(1)(am). T.W.P. argues that Portage County ("the County") did not present evidence sufficient to support these conclusions. I agree with T.W.P. and accordingly reverse the extension of his commitment and the medication order.

## BACKGROUND

¶2 T.W.P. has schizophrenia. He is in his early sixties, and has received services from the County for more than 25 years. According to the testimony at the recommitment hearing, in 2008 or 2009 there was an incident in which T.W.P., "minimally clothed," was behaving in an agitated manner and carrying a hatchet or possibly a hammer in public.[2] This led to T.W.P. being committed under WIS. STAT. ch. 51, and this commitment has been extended ever since, most recently in December 2024.

¶3 The County called two witnesses at the December 2024 hearing: Jeffrey Marcus, a psychiatrist who had examined T.W.P. by videoconference, spoken with others who worked with T.W.P., and reviewed records; and a case manager who had worked with T.W.P. since 2000.

---

[2] The record transmitted to this court for appeal does not contain documents from the commencement of T.W.P.'s commitment, and more recent records are ambiguous as to which year this incident occurred.

¶4     Marcus testified that at the recent examination, T.W.P. was pleasant and cooperative, and displayed several psychotic symptoms, including thought blocking (described by Marcus as losing track of thoughts for brief periods), disorganized thinking, and bringing up "delusional topics," such as attributing his schizophrenia to an "evil commandment from God," and saying that the medication he was taking was causing deposits to form on his eye.

¶5     T.W.P. told Marcus that T.W.P. has auditory hallucinations approximately twice a week, but that these hallucinations do not distress him or give him commands, and that he is "used to them." T.W.P. also acknowledged his schizophrenia diagnosis, but "was not able to tie that to [his] psychotic symptoms."

¶6     Asked what sort of treatment T.W.P. requires, Marcus testified that T.W.P. does not need inpatient care, but that he "does require the supports and structure of the group home to maintain treatment and his care" and that Marcus "would worry about him if he weren't receiving that level of support." Marcus opined that if T.W.P.'s medication were stopped and he were not in a structured environment, "he would lose the ability to manage even his basic cares." Marcus added that he "worr[ies] that [T.W.P.'s] psychosis would worsen, that his behavior would become more erratic."

¶7     Regarding T.W.P.'s existing medication regimen, Marcus testified that T.W.P. was "very clear that he did not like his current medications." Marcus added that T.W.P. "was legit in some of his concerns about his medicines, but there was a lot of delusional content that was contained when he would talk about them." Marcus's report, which was admitted into evidence, noted that T.W.P. had signs consistent with tardive dyskinesia, a neurological disorder causing

uncontrollable bodily movements that is caused by antipsychotic medications. *See State ex rel. Jones v. Gerhardstein*, 141 Wis. 2d 710, 727 & n.10, 416 N.W.2d 883 (1987), *superseded by statute on other grounds* (describing tardive dyskinesia). Marcus also testified that T.W.P. "did not understand how the medications were used to target [his] symptoms," that T.W.P. said that his psychosis had "either been caused or worsened" by the medications, that T.W.P. "doesn't see how the medicines are helping him," and that T.W.P. told him "that if he were to stop the medications, he would become more productive and do better."

¶8     Asked whether T.W.P. would take his medication if he were released from commitment, Marcus testified, "I don't think so. He has been compliant while he's been at the facility he's at now…. But he had very specific complaints about his medications, and he did state he wanted to take different medications. He was very clear what he wanted to do." Marcus explained further that T.W.P. would prefer a medication different than he currently takes; specifically, T.W.P. desired an injectable medication he has taken in the past, and which is not typically given every day. Marcus testified that T.W.P. also wanted medication for attention deficit hyperactivity disorder and anxiety, though Marcus thought this "may not be in [T.W.P.'s] best interests." Marcus testified that he believed that T.W.P.'s medication benefits him, saying he "has not exhibited any dangerous behavior that I'm aware of since I last saw him and for quite a while before that to my knowledge." Marcus also noted that T.W.P. "did not tell me he will stop his medications. He voiced his objection to his medication and was clear on what he would rather have. And he has been compliant with his medications at his current facility. I don't think he is outwardly not taking his meds. That's my understanding. But I believe, based on what he told me, that he would have no reason to keep taking his medications if he didn't have to."

¶9    Marcus testified that he believed T.W.P. satisfied the third standard of dangerousness, which would require T.W.P. to evidence "such impaired judgment … that there is a substantial probability of physical impairment or injury" to himself or others. WIS. STAT. § 51.20(1)(a)2.c. Marcus also endorsed the fourth standard, which would be satisfied if

> due to mental illness, [T.W.P.] is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless [T.W.P.] receives prompt and adequate treatment for this mental illness.

§ 51.20(1)(a)2.d. As to each of these grounds, Marcus also testified that he was relying on the evidentiary path found in § 51.20(1)(am) and applicable to extensions of prior commitments: that T.W.P., rather than exhibiting a pattern of recent acts or omissions indicating dangerousness, "would be a proper subject for commitment if treatment were withdrawn."

¶10    Asked specifically how T.W.P. would likely become dangerous if treatment were withdrawn, Marcus testified that he "worried" that T.W.P. "would not be able to satisfy his basic care requirements. I'm worried that his nutrition, his housing, his ability to self-direct his daily activities – all those would become grossly impaired. These would worsen if he stopped his medications and if he didn't have daily support." Asked if T.W.P. "could thrive in a less restrictive environment at this time," Marcus opined that T.W.P.'s then-current living arrangement in a community based residential facility was "a level of care that he's going to need."

¶11    On cross-examination, Marcus agreed that he had no information to suggest that T.W.P. had issues with feeding himself or otherwise caring for

himself. Asked about T.W.P.'s views of his medication, Marcus testified that T.W.P. told him that he doesn't like the way one of his medications makes him feel, "and that has to be taken seriously, of course." Marcus testified that T.W.P.'s complaints about this medication were not uncommon among those who take it, and that Marcus therefore "inferred" that the complaints were "legitimate." Regarding the medication T.W.P. said he would prefer to take, Marcus testified T.W.P. said it "didn't make him feel bad and … it didn't prevent him from behaving the way he wanted to." Marcus noted that T.W.P. told him he sleeps a great deal, and that T.W.P. believed his medication regimen was responsible for this; Marcus added that sleepiness could be a side effect of T.W.P.'s medication.

¶12 The County next called T.W.P.'s case manager. She testified that when she started working with T.W.P. (in the year 2000) he had been incarcerated at the jail several times. She testified that he would take his medication "intermittently" and "would use substances excessively." She later clarified that the substance in question was ephedrine, and that T.W.P. "would report that he would purchase" it; she did not witness him using it excessively. She also testified that T.W.P., who was living independently in an apartment at that time, kept his home in "disarray" and had defecated on the floor on multiple occasions, and had been directed to clean it up. She testified that T.W.P. has been compliant with his medication since he was "placed" in 2009. She testified that T.W.P. requires guidance in order to "thrive," and that this would be "very difficult" if he were living in a less restrictive environment. She testified that she believed T.W.P. would be dangerous if treatment were withdrawn due to "decompensation and his ability to care for self" and because of the events in 2008 or 2009 that led to his commitment.

¶13 The circuit court entered an order extending T.W.P.'s commitment for one year. It concluded that T.W.P. was dangerous under both the third and fourth standards (WIS. STAT. § 51.20(1)(a)2.c. and d.) based on a determination that T.W.P. would become "a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am). T.W.P. appeals.

## DISCUSSION

### I. General principles and standard of review.

¶14 To commit a person under WIS. STAT. ch. 51, whether initially or as an extension of an existing commitment, the petitioner must show that the person is mentally ill, a proper subject for treatment, and currently dangerous. *Sauk County v. S.A.M.*, 2022 WI 46, ¶4, 402 Wis. 2d 379, 975 N.W.2d 162; WIS. STAT. § 51.20(1)(a)1. and 2. In this case, both on appeal and in the circuit court, the parties' dispute is limited to whether T.W.P. is dangerous: T.W.P. contends there was insufficient evidence to support the court's conclusion that he was. Each statutory dangerousness criterion requires a "substantial likelihood" that the dangerous acts or conditions described will occur; in this context that means the petitioner must show that the dangerous outcome is "much more likely than not." *Marathon County v. D.K.*, 2020 WI 8, ¶¶35, 61, 390 Wis. 2d 50, 937 N.W.2d 901 (R. Bradley, J., concurring). The petitioner must make this showing by "clear and convincing evidence." § 51.20(13)(e).

¶15 In a WIS. STAT. ch. 51 proceeding, "[a] determination of dangerousness is not a factual determination, but a legal one based on underlying facts." *Langlade County v. D.J.W.*, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277. Accordingly, this court reviews a ch. 51 commitment using a mixed standard, upholding the circuit court's factual findings unless they are clearly

7

erroneous, but independently deciding whether these facts satisfy the legal standard. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

## II.  The County did not show by clear and convincing evidence that T.W.P. is currently dangerous.

¶16    As noted above, the circuit court determined that T.W.P. was dangerous under the third and fourth statutory standards, and on appeal the parties have likewise confined their arguments to these two standards, found in WIS. STAT. § 51.20(1)(a)2.c. and d. (both as modified by the § 51.20(1)(am) mode of proof to permit a determination of dangerousness if T.W.P. would become a proper subject for commitment should treatment be withdrawn).  Although the two standards establish two separate forms of dangerousness, in this case the issues and arguments implicated by each are similar and intertwined, and this opinion will discuss them in tandem.

¶17    For each dangerousness standard, as is often true when a petitioner seeks to extend a WIS. STAT. ch. 51 commitment, the County sought to prove T.W.P. dangerous by showing that if he were not subject to continuing commitment, he would not take his medication, and that if he did not take his medication, he would engage in dangerous behavior that he has not evidenced during the time he has been committed.  The County acknowledges that T.W.P. has not shown any "outwardly dangerous behaviors since being placed on commitment" in 2008 or 2009.  The County argues, though, that T.W.P. lacks insight into the benefits of his medication, and that because of this lack of insight, he would stop taking his medication if he were not obligated to do so by a ch. 51 commitment order and corresponding involuntary medication order.  If T.W.P. were to stop his medication, the County reasons, there is a high chance his

symptoms would worsen, creating a situation in which one or both of two situations would arise: T.W.P. would (1) have such impaired judgment that there would be a "substantial probability of physical impairment or injury to [T.W.P.] or other individuals," WIS. STAT. § 51.20(1)(a)2.c.; and/or he would (2) be "unable to satisfy [his] basic needs for nourishment, medical care, shelter or safety" creating a substantial possibility that "death, serious physical injury, serious physical debilitation, or serious physical disease [would] immediately ensue," § 51.20(1)(a)2.d.

¶18     T.W.P., on the other hand, argues that the County has shown neither that he would stop his medication if not committed, nor that a failure in medication compliance would create a substantial likelihood of physical impairment, injury, debilitation, or serious disease.

¶19     I conclude that the County has failed to produce clear and convincing proof that T.W.P. is dangerous. The sum of the testimony from each of the County's two witnesses was ambiguous as to whether T.W.P. would continue to take his medication if he were not committed. The evidence as to how T.W.P. would behave if he failed to adhere to his prescribed regimen was still more lacking, and did not show him dangerous under either the third or the fourth standard.

¶20     Regarding medication compliance, T.W.P.'s case manager testified that although T.W.P. had been compliant during his commitment, he had not been "consistent" in taking his medication before he was committed: that is, before 2008 or 2009. While this testimony bears on the question of whether T.W.P. would take his medication if not committed when the extension hearing occurred in 2024, its probative power is severely limited, both by the passage of time and

9

by the lack of specificity of the testimony itself. The case worker did not say how often T.W.P. missed his medication before 2008 or 2009, nor did she give further details, saying only that his compliance was "intermittent[]." If T.W.P. missed some doses due to forgetfulness, that would be very different from T.W.P. intentionally refusing his medication over a lengthy period. It was the County's burden to present specific facts demonstrating that it is "much more likely than not" that T.W.P. is dangerous. *See **D.K.***, 390 Wis. 2d 50, ¶¶35, 61 (R. Bradley, concurring). Testimony that before 2008 or 2009, T.W.P. sometimes took his medication and sometimes did not provided some support for an inference that T.W.P. could have trouble complying with a medication order in 2024. But the nonspecificity of this testimony limits its probative value.

¶21 Marcus's testimony on this point was similarly ambiguous. Marcus was not T.W.P.'s treating physician, but had examined him in anticipation of the commitment extension proceedings. He testified that T.W.P. conveyed "a lot of delusional content" when talking about his medication, did not understand how the medication ameliorated his symptoms, and believed the medication actually caused or worsened these symptoms and that he would "become more productive and do better" without them.

¶22 Allowing that T.W.P.'s statements could give rise to a concern that he would refuse medication, that concern is not equivalent to a showing that T.W.P. is "much more likely than not" to do so. Marcus also testified that T.W.P. was "very clear that he did not like his current medications," and that in Marcus's opinion, at least some of T.W.P.'s objections to his specific medications—how they made him feel, and effects on his ability to stay awake—were "legitimate." Marcus further explained that T.W.P. had a specific preference for a different medication, and although Marcus believed this medication would be inconvenient

10

to take over the long term, he did not know of any specific harms that would come to T.W.P. from doing so.

¶23    Marcus further testified that T.W.P. "did not tell me he will stop his medications. He voiced his objection to his medication and was clear on what he would rather have. And he has been compliant with his medications at his current facility." That T.W.P. did not like some of the effects of his medication and wanted to try other options is not strong evidence that he would refuse any appropriate medication if given the choice. On the whole, Marcus's assertion that T.W.P. "would have no reason to keep taking his medications if he didn't have to" was not supported by the evidence, nor does it establish a substantial likelihood that T.W.P. would stop taking his medication absent an order requiring it.

¶24    The evidence suggesting T.W.P. would behave dangerously if treatment were withdrawn was still more attenuated. The WIS. STAT. § 51.20(1)(am) mode of proof recognizes that a lack of recent dangerous behavior may be attributable to treatment. It therefore permits a determination that a person is dangerous because, in the absence of commitment, a person's treatment would cease, leading to dangerous behavior that has been absent due to treatment. *State v. W.R.B.*, 140 Wis. 2d 347, 351-52, 411 N.W.2d 142 (Ct. App. 1987). Nevertheless, a court considering a commitment petition must "assess the nature and timing of dangerous statements or conduct alleged to have pre-dated the original commitment." *Winnebago County v. S.H.*, 2020 WI App 46, ¶13 n.6, 393 Wis. 2d 511, 947 N.W.2d 761. "'[I]t could be a winning argument against recommitment that dangerous statements or conduct are old enough, weak enough, or otherwise insufficient to support clear and convincing evidence under the substantial likelihood of the dangerousness test.'" *Id.* (quoted source omitted).

11

¶25    Here, the evidence of T.W.P.'s dangerous conduct is "old enough, weak enough, [and] otherwise insufficient," such that it cannot serve as a basis to conclude that he is currently dangerous.  As the circuit court noted, for "every year that passes, it becomes a little more difficult to tie how [T.W.P.] is doing now with what occurred" in 2008 or 2009, before he was committed.  Testimony that T.W.P. was "minimally clothed," appeared agitated, and was carrying a hammer and/or a hatchet in public in 2008 or 2009 appears to have satisfied the County's burden of showing that T.W.P. was dangerous in 2008 or 2009.  But as the court recognized in its comments, the same testimony is much less potent evidence that T.W.P. was dangerous in 2024.  Even given the passage of time, perhaps the details or context surrounding this incident would give more support for a conclusion that T.W.P. is currently dangerous.  But no further evidence about this incident was submitted to the circuit court, and that court's own comments suggest that it also believed it was missing useful information about the 2008 or 2009 incident.

¶26    Perhaps recognizing this, the County did not rely heavily on this incident in its case.  Neither of the two witnesses the County called had firsthand knowledge of the incident, and T.W.P. successfully objected to some of the testimony about that incident as hearsay.[3]  Notably, the County did not argue that T.W.P. was dangerous under the second standard, which would apply if he evidenced a "substantial probability of physical harm to others," including by placing others "in reasonable fear of violent behavior and serious physical harm" by his actions or threats.  *See* WIS. STAT. § 51.20(1)(a)2.b.

---

[3] T.W.P. lodged a number of hearsay objections, some of which were sustained in whole or in part.  This opinion generally omits reference to testimony that was excluded on these grounds.

¶27 Instead, the County sought to prove that T.W.P. was dangerous under the third and fourth standards, which respectively require "impaired judgment" creating a "substantial probability of physical impairment" to T.W.P. or others, WIS. STAT. § 51.20(1)(a)2.c., or behavior showing T.W.P. "is unable to satisfy basic needs for nourishment, medical care, shelter or safety," § 51.20(1)(a)2.d. To these points, Marcus testified that "if [T.W.P.'s] medications were stopped if he weren't in a structured environment, he would lose the ability to manage even his basic cares," and would "become more erratic," and "more disorganized." Marcus testified that he was "worried that [T.W.P.] would not be able to satisfy his basic care requirements," including "his nutrition, his housing, his ability to self-direct his daily activities -- all those would become grossly impaired." Marcus further opined that T.W.P. would become more agitated if he stopped his medication. The case worker also testified that she believed that T.W.P. would be dangerous if not medicated, citing the incident that led to his original commitment and "his ability to care for self." She testified, however, that she was not aware of any concerns about T.W.P.'s eating or drinking, even before he was committed.

¶28 Relevant to the third standard, no evidence was presented about any impaired judgment on T.W.P.'s part related to his physical safety within the past 15 years. Nor was there evidence as to the fourth standard that T.W.P. has shown characteristics that would suggest he has been unable to "satisfy basic needs" during the same period. The case manager agreed that T.W.P. has not, to her knowledge, had issues with feeding himself. The sole evidence regarding T.W.P.'s difficulties with basic needs before his commitment related to the "disarray" of his apartment and some unknown number of occasions in which there were feces, which T.W.P. ultimately cleaned up, on the apartment floor. No

evidence was given that T.W.P. has ever failed to satisfy any of the other basic needs listed in the fourth standard. And although Marcus testified generally that he believed T.W.P. would be unable to "manage even his basic cares" absent commitment, he did not identify any "basic cares" with which T.W.P. has had trouble either before or during his present commitment. Even in view of an expert's conclusion that a person meets the dangerousness standard, "conclusory opinions parroting the statutory language without actually discussing dangerousness… are insufficient to prove dangerousness in an extension hearing." *S.H.*, 393 Wis. 2d 511, ¶17. Without identifying evidence that T.W.P. has failed to satisfy his basic needs in the past, or other evidence tying T.W.P.'s mental condition to an inability to satisfy his basic needs, Marcus's bare opinion that T.W.P. would become unable to satisfy his basic needs is insufficient to meet the County's burden.

¶29 It is possible that T.W.P. has not demonstrated such an inability since 2008 or 2009 because of the treatment he has received during this time. But if that is true, the County presented no evidence about that possibility at the 2024 recommitment hearing; in fact, the County presented almost no evidence about anything that has occurred since 2008 or 2009. The testimony included little information about T.W.P.'s daily life, his medication, or his symptoms between 2008 or 2009 and Marcus's 2024 interview. Although the WIS. STAT. § 51.20(1)(am) mode of proof contemplates an inference that a person's nondangerousness during commitment is the result of treatment, such an inference requires some evidentiary foundation. With little information about T.W.P.'s condition in recent years—including almost no information about T.W.P.'s behavior—the evidence was insufficient to satisfy the County's burden to show that he would become a proper subject for commitment if treatment were

withdrawn. The order extending T.W.P.'s commitment must therefore be reversed, and because there can be no involuntary medication order without an underlying commitment, *see* WIS. STAT. § 51.61(1)(g), this order must be reversed as well.

## CONCLUSION

For the reasons given, I reverse T.W.P.'s commitment order and the associated order for involuntary medication and treatment.

*By the Court.*—Orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.